## Athens Mining Company v. Annie Carnduff.

### Gen. No. 4,530.

1. MINERS' ACT—*what wilful violation of, sufficient to authorize recovery for personal injuries.* The conduct of a mine owner in failing to examine his mine upon Sunday and in permitting his men to enter and work therein without such prior examination, is a wilful violation of the Miners' Act upon which a recovery for personal injuries may be predicated.

2. ADMISSION—*when competent against master.* A statement material to the issue or an admission with respect to the subject-matter in dispute made by an employee whose position is such as to make him the representative of his master, is competent against such master.

3. MASTER—*when proof of knowledge of danger competent against.* While it may not be an essential to recovery, it is nevertheless competent to show that the master, through his representative, had knowledge, prior to the accident, of the danger which resulted therein.

4. "PROXIMATELY CONTRIBUTED TO"—*held, not erroneous.* The use of the phrase "proximately contributed to" in lieu of that of "proximately caused," held, not erroneous under the facts of this case.

Action on the case for personal injuries. Appeal from the Circuit Court of Peoria County; the Hon. NICHOLAS E. WORTHINGTON, Judge, presiding. Heard in this court at the April term, 1905. Affirmed. Opinion filed October 25, 1905.

WINSLOW EVANS and JAMES M. GRAHAM, for appellant.

OLIVER R. BARRETT and JOHN A. BLOOMINGSTON, for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

The Athens Mining Company operates a coal mine in Menard county, Illinois. At about twenty minutes after three o'clock in the morning of March 23, 1903, an explosion occurred in said mine, resulting in the death of six miners and the serious injury of another. Carnduff, one of those who were killed by the explosion, left a wife and children surviving. The widow brought this action against the coal company to recover damages for loss of support. The declaration originally consisted of four counts. The first and fourth counts were dismissed during the trial. The second count charged a wilful violation of that portion of the statute of this state relating to coal mines which requires the mine examiner to visit the mine before the men are permitted to enter, to inspect the places where men are expected to pass or work, and observe whether there are any accumulations of gas or other unsafe conditions, etc. The third count charged a wilful violation of that portion of said statute which provides that when working places are discovered in which accumulations of gas exist, the mine examiner shall place a conspicuous mark thereat, as notice to all men to keep out, and immediately report his finding to the mine manager, and that no one shall be allowed to remain in any part of the mine through which gas is being carried in a ventilating current, or to enter the mine to work therein, except under the direction of the mine manager, until all conditions shall have been made safe. Defendant pleaded the general issue. There was a jury trial, and a verdict and a judgment for plaintiff for $1,500, and defendant prosecutes this appeal.

There was an entry in the mine leading from the bottom of the shaft a long distance into the mine, known as Main East. Off from this there were two entries, known as ninth south and tenth south. Off from the ninth south to

the west were two stub entries, known as first west and second west, and off of tenth south, about as far south as second west, were stub entries known as first east and second east. There was a distance of about thirty or thirty-five feet between ninth and tenth south. Air was forced through the mine by machinery, and the air came east on the Main East. In order to force the air through these side entries, barriers, either doors, curtains or stoppings, were erected in various places. Thus in Main East, between ninth and tenth south, was a barrier, so that the current of air forced from the west and reaching that point was obliged to turn south in ninth south. There was a like barrier between first and second west, so that when the air proceeding down ninth south reached first west, it turned west on that entry, and then south again into second west through a cross cut, then back into ninth south, and then on south in ninth south. The practice in the mine required a cross cut about every sixty feet. There was a cross cut between ninth and tenth south, about opposite second east off tenth south, and in that cross cut was a door swinging both ways on hinges. South of that was another cross cut which was barricaded with earth, known as a stopping. South of that was the last cross cut, and there the air turned east, passed into tenth south, and went north in tenth south till it reached second east, when, turned aside from tenth south by a stopping there erected, it passed east in second east to the first cross cut, then north to first east, then west again to tenth south, then north in tenth south to Main East, and then east for a considerable distance, when it again turned north through a cross cut into an entry known as Back East, and west upon it to an entry turning north therefrom, known as eighth north, and passing through various side entries, the current of air returned through seventh north to Back East, and upon it went west again to some point not disclosed by the evidence. The faces of entries ninth south and tenth south were being carried further south, and had been carried beyond the place where another cross entry was required to

be cut, and the cutting of such cross entry had been begun, both from ninth south and from tenth south, and at the time of the last examination of the mine this new cross cut had been cut in probably ten feet from ninth south to the east, and had been cut in from tenth south to the west a greater distance, so that there was on the Saturday preceding this accident probably six or seven feet of uncut coal before the cross cut would be opened through. Some ten days or more before this accident, gas had been discovered towards the face of the ninth south and south of the open cross cut. This gas is lighter than air, and was, therefore, in the top of the entry. The entry was intended to be about eight feet wide and five and one-half to six feet high. Just beyond the cross cut some officer of the mine placed two iron bars against the sides of the entry, and set a shovel, bottom up, resting against the bars, and wrote upon it with chalk, "Gas, keep out," and the miners who had been working on the face of ninth south and on the face of the new cross cut being opened towards the east, were ordered away from that spot. No further work was done on the face of that entry or on that side of the cross cut. Work, however, was continued upon the face of tenth south, and upon that side of the cross cut then being cut through. The mine was examined on Saturday, March 21, but it was not examined on Sunday, and men worked in the mine. Carnduff went down Sunday night, and at the time of the explosion was in ninth south entry, north of the first west. Borings had been made into the coal on the face of the tenth south entry, and on the face of that side of the cross cut then being cut through, and powder had been placed in these borings, tamped down, and fuses inserted, and these were fired, and the miner who had done the work retired from the immediate vicinity. An explosion followed, which created considerable havoc in that part of the mine. Imkey, who had done the work where the blast and explosion occurred, seemed to have just passed through the door from tenth south into ninth south directly opposite second east, and was found dead

there. A short distance north of him in said ninth south, another man was found dead. On the face of the second west another miner was dead, and in the ninth south, north of the first west, at intervals between that and Main East, two miners were found dead, one of whom was Carnduff; and in Main East, quite a long distance west of ninth south, two more miners were found, one dead and the other badly burned. According to the proof in this case, a powder explosion follows the current of air, while a gas explosion goes against the current of air. The proof shows that gas in a mine is not necessarily dangerous; that its danger depends upon the extent to which it is mixed with air. If the gas is comparatively unmixed with air, it will not explode, and if it is very much weakened by air it will not explode. But if one part of gas or fire damp is mixed with about nine and one-half parts of air, it is exceedingly explosive, and is called by the miners "wicked" or "vile" gas. It is shown that when this mine had been examined prior to this accident, the gas was not then wicked.

It is practically conceded that defendant had violated the law in the respects charged in the second and third counts of the declaration. It had knowledge of the existence of the gas at the end of the ninth south entry, and it did not inspect the mine on Sunday, but permitted men to go into the mine without its being inspected, and to work in the immediate vicinity of that gas, contrary to the statute. The proof shows that when shots placed in borings in the coal in the process of mining have their proper effect, the force of the powder explosion takes effect upon the side of the boring, throwing the coal out into the entry, and thereby expending the force of the powder; but that sometimes shots go directly out of the hole, and do not disturb the sides of the hole, and do not therefore mine out any coal, and that then the force and effect of the explosion of the powder takes effect in the entry, and is felt for quite a long distance away; that shots are usually timed by the length of the fuse, so as to explode in succession and not at the same instant, and that after one shot has blown out, it

creates such a condition of the air thereabouts that if the next shot blows out, a much greater explosion in the air takes place. The shots which blow out without disturbing the coal are called "windy shots." The proof tends to show that when the work done on the face of the tenth south and on that face of the cross cut then being cut was examined after the explosion, it was found that several of the shots then fired had taken effect as windy shots; and that some of the shots in the cross cut then being dug had gone through and had blown a hole through into ninth south, and therefore into or near to the accumulation of gas already spoken of. The case of the plaintiff depends upon her proposition that when this shot blew a hole through the new cross cut into ninth south, this accumulation of gas was thereby exploded in the ninth south, and that that explosion caused the death of Carnduff. The defense rests upon its proposition that this explosion was merely a powder explosion and in tenth south, caused by the windy shots. The court instructed the jury that if the latter proposition was true, plaintiff could not recover.

Defendant, in a forcible argument, has presented many conditions found in tenth south and second and first east after the explosion, and also many conditions found in the cross cuts, which it relies upon as showing that the explosion was purely a powder explosion in tenth south and the cross cut. The two most forcible of their contentions arise from the following facts: those who first succeeded in penetrating the mine after the doors blown open and curtains torn down had been restored, so that the current of air had been forced through the region of the explosion and the "after damp" carried away, so that a human being could live in that portion of the mine, testified that they found the shovel above referred to still standing up against the cross bars just south of the open cross cut in the ninth south. Defendant argues that if there had been a gas explosion in the south end of ninth south, it must have thrown down this shovel; to which plaintiff's only reply is that probably the officers of the company who first en-

tered the mine after the explosion put it back in place; a proposition upon which there is no proof. It may be that as this gas was in the roof only of that entry, it could explode, and the force of the explosion pass north along the top of the entry without disturbing that which was below the gas on the floor of the entry. The second strong point presented by defendant is that the door, which could swing both ways on its hinges, in the cross cut between ninth and tenth south directly opposite second east, seemed to have been opened towards ninth south. It was off from its lower hinges, and, as we infer from the proof, the bottom was in towards tenth south, and the top leaned towards ninth south. Defendant argues therefrom that the force which opened that door came from tenth south, while plaintiff argues that as the part broken off the hinges was forced to the east towards tenth south, the force must have come from ninth south entry. As already stated, Imkey, who had fired the fuses in the tenth south entry and then left the immediate vicinity, was found dead just west of this door, and it is at least entirely probable that he had just passed through this door, and the explosion may have occurred while he had the door open and was in the act of passing through it. The feature of the evidence which strongly tends to show that this was an explosion of gas in the ninth south, and not a powder explosion in the tenth south, appears in this wise: It is shown by the proof offered by both sides that a powder explosion follows the current of the air, while a gas explosion goes against the air. Therefore, if this was a powder explosion, its force and effect should have passed north on tenth south, then east on second east, then north through the cross cut into first east, then west to tenth south again, and then north to Main East, and east on Main East to the cross cut, and north to Back East, and west on Back East to eighth north, then north on eighth north, and so on by the course already described, as the current of air traveled. The fact that the door was found open and off its hinges at the cross cut opposite second east between ninth and tenth south, would not, under

Athens Mining Co. v. Carnduff.

the proof, permit the force of this explosion to go into ninth south and follow the course against the air, but the current of the powder explosion, according to the proof, must still have gone with the current of air in the course above indicated. In the earlier part of the course above described, in the part of tenth south nearest the face of the work, and in second and first east, there were found various disturbances of tools and other things. But there was also great disturbance against the air, in ninth east, second and first west, and Main East west of ninth south, and, as already stated, men were found dead in that course, against the force of the air, for a long distance back; and, under the proofs, the force of the explosion could only have been carried by an explosion of gas to the places where those men were found dead. To our minds, from a consideration of the evidence, it seems quite probable that both explosions occurred. There were windy shots, which caused an explosion in tenth south, and the effect of which was observable in that entry at least as far north as its connection with first east. But one of the shots in the cross cut then being cut through from east to west between the tenth and ninth did take effect in the coal and it blew through directly into the region where this gas then stood, and the effects found on the way back against the current of air, in ninth south and Main East, and the bodies of six dead men, tend strongly to show that a gas explosion did occur in the upper end of ninth south when one of these shots blew through. If so, then the company is responsible, notwithstanding there may also have been a powder explosion at the same time because of other shots which took effect as "windy shots;" and it would seem that it must be so, notwithstanding the fact that if certain testimony introduced by defendant is true, the shovel right underneath this accumulation of gas in the roof was not blown down. It is no answer to say that the gas was not "wicked" when the mine was examined on Saturday morning. It may have become dangerous and liable to explode after that; and the law required defendant to cause it to be ex-

amined before it permitted men to enter the mine on
Sunday. Its conduct in failing to examine the mine on Sun-
day, and in permitting men to enter and work in the mine
Sunday morning and Sunday night without such prior ex-
amination, was a wilful violation of the statute. Spring
Valley Coal Company v. Rowatt, 96 Ill. App. 248, 253.
The question, therefore, whether this was a powder explo-
sion or a gas explosion, or both, was peculiarly one for the
jury in view of this conflict of the evidence, and we do
not feel warranted in disturbing its conclusion on that
subject.

The court permitted certain witnesses to testify to a
statement made to them by defendant's fire boss and mine
examiner, Cooper, a few days before the explosion, the
general meaning of which was that if the men at work in
the tenth south entry at the cross cut then being driven
towards the ninth entry, should blow through into the gas
at the face of the ninth south, he would not like to be in
there, (that is, in the ninth south,) when it would blow
through—that it would blow them into hell. One of these
witnesses testified to such a statement made by Cooper
when they were outside the mine and not at work, and this
the court afterwards excluded. The other conversation
was in the mine. Cooper was acting for the company, and
held an important position. His knowledge of the danger
of the situation was the knowledge of the company. An
employee was steadily at work in tenth south entry, cut-
ting a cross cut towards the ninth, and driving into and
exploding shots in the thin barrier of coal between the
place where he was working and the part of that cross cut
already dug out on the side of the ninth south. He was
liable to blow a shot through at any time into the end of
the ninth south, where the mine examiner knew and the
other active managers of the mine generally knew that
there had been gas for over a week, sufficiently dangerous
to cause defendant to take the men out of the work in the
end of the ninth south. While it was not necessary to show
defendant's knowledge of the conditions resulting from its

Athens Mining Co. v. Carnduff.

wilful violation of the statute, yet we are of opinion that it was not harmful to defendant, to show that three or four days before the accident defendant's fire boss and mine examiner knew that what was then being done in the tenth south was dangerous to the lives of the men in that part of the mine, especially in view of the very low damages awarded by the jury.

The instruction given at plaintiff's request defined a wilful failure to comply with the statute, and then, among other things, said that if defendant knowingly and deliberately failed to comply with the provisions of the statute set out in the second and third counts of the declaration, and if such wilful failure proximately contributed to the accident and the injury therein complained of, then plaintiff was entitled to recover. It is urged that the court erred in using the words "proximately contributed to" instead of "proximately caused." We see no error in the instruction, as applied to the facts in this case. If the gas exploded, and if the explosion of the gas caused Carnduff's death, then it was because the shot fired through the new cross cut from tenth south into ninth exploded the gas. It was only in that event there could be a recovery, under plain instructions given at the defendant's request. If the gas exploded and caused Carnduff's death, then the failure to comply with the statute proximately contributed to the accident, and also proximately caused it. If the gas did not explode and cause Carnduff's death, then defendant's instructions required a verdict for defendant. We find no reversible error in the record. The judgment is therefore affirmed.

*Affirmed.*